## APPEAL OF PETERSON & PEGAU BAKING CO.

Docket No. 1628.   Submitted July 17, 1925.   Decided September 28, 1925.

Upon the evidence, *held*, that payments made by the taxpayer to its principal stockholders on account of alleged royalties for the use of a pretended secret process were distributions of profits and not deductible from taxable income.

*H. B. McCawley, Esq.*, for the taxpayer.
*A. Calder Mackay, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits taxes for the years 1919 to 1921, inclusive, in the amounts, respectively, of $18,814.84, $19,686.01, and $18,730.70, a total of $57,231.55, of which approximately $37,000 is in controversy. The sole issue in the appeal is whether alleged royalties for a certain secret baking process are proper deductions from gross income.

### FINDINGS OF FACT.

The taxpayer is a Nebraska corporation engaged in the general baking business, with its principal place of business in Omaha. During the years in question the entire capital stock of the taxpayer was owned in equal proportions by P. F. Peterson and L. M. Pegau.

The taxpayer was organized originally in 1893 under the name of the U. P. Steam Baking Co. In 1917 the name was changed to Peterson & Pegau Baking Co. P. F. Peterson was connected with the corporation from its organization, and has been its president since 1907. He is a prominent and successful baker, a member of the board of governors of the American Bakery Association, and was during the war chairman of the baking division of the State of Nebraska under the Federal Food Administration. In 1918 the taxpayer constructed a new plant in the City of Omaha with a capacity of approximately double that of the one previously occupied.

At the time of occupying its new plant the taxpayer purchased and used new and improved machinery for the preparation of its bread and produced an improved product. Both the gross and net income of the taxpayer and its sales of bread increased rapidly from 1918 to 1919 and during subsequent years.

Prior to 1918 the taxpayer had used, under a contract with Ivan B. Nordheim Co., of Pittsburgh, Pa., a trade-name for bread, known as "Tip Top Bread," and a formula for making the same furnished by the Nordheim Co. It was required, under the contract, that the taxpayer purchase from the Nordheim Co. all advertising matter for "Tip Top Bread" and the pans in which the same was baked, and that it expend, in addition, not less than $1,875 annually in local advertising. Bread was still being manufactured under this contract in the years here in question.

During the year 1918 and subsequent thereto the bread produced by the taxpayer scored substantially better under the baking tests of the American Institute of Baking than did that of any of its competitors.

Under date of May 12, 1920, the taxpayer entered into a written contract with Peterson and Pegau, agreeing to pay to each of them, in equal amounts, a royalty equal to one-third of the net profits for the use of a certain alleged secret process in connection with the baking of bread. This contract was made retroactive for the year 1919 and applied also to the year 1920. It provided also for an annual renewal and was actually renewed on January 3, 1921, for that year.

Pursuant to this contract there were paid to Peterson and Pegau in the three years in question the amounts of $41,786.64, $39,734.76, and $26,108.50, as alleged royalties for said alleged secret process. The Commissioner declined to allow these payments as deductions from gross income, claiming that the alleged royalty contract was a mere cloak for the disguise of a distribution of profits in an effort to reduce taxable income. From this disallowance the taxpayer appealed to the Board.

DECISION.

The determination of the Commissioner is approved.

## OPINION.

JAMES: The major portion of the record before the Board consists in an extensive examination of Peterson relative to the alleged secret process upon which the royalties as set forth in the findings of fact were predicated. The testimony convinces us that Peterson is a successful baker and that he made effective use of the new bakery and new equipment acquired in 1918 by the taxpayer. We are not convinced that he is in possession of any particular method which could be the subject of a secret process for monopolistic use by either himself or the taxpayer.

Louis J. Gregerson was offered as a witness for the taxpayer, and his testimony in respect of the origin of the contract of May 12, 1920, may be considered as at least putting forward the most favorable possible statement of the facts. Gregerson's testimony relative to the origin of the contract is as follows:

I made out the tax returns for 1917 for the company, and also the individual stockholders, and also during the early part of 1919 I installed their cost system in the bakery there. I spent probably three or four weeks working out a cost system. That was after the installation of this new process. The officers wanted to know whether they were making money or losing money on the new process, and I figured out their cost system. They wanted to know whether they were making money or losing money by the use of the new process. The result of several weeks' work showed that they were making a very substantial profit, over a thousand dollars a week, and probably two thousand. The question then came up what would the taxes be for the corporation at the end of the year. They expected to make a very substantial profit on this new formula. I estimated the amount of tax—I cannot recall the figures now, but I believe that I estimated an income of $100,000 for 1919. The question was then raised as to whether there was any legitimate way under the law to reduce the tax liability. I explained the various ways that I knew. One of them, the first one, was to dissolve the corporation and continue the business as a partnership. Another method would be to revert to the method used by the company prior to 1917, during which prior method the individuals owned the plant, and the corporation was paying rent for the use of the plant. There would be the other method of the individuals operating the plant and the corporation owning the plant. There would be another method of paying increased salaries, and then there was this question of royalties. I cannot recall whether I suggested that or the officers of the corporation suggested that. As to my recommendation to the company that the corporation be dissolved, and the business be continued under the partnership, that would involve a tax of about $15,000.00. The two stockholders were afraid to take that chance of paying $15,000.00 for the privilege of dissolving the corporation inasmuch as the future was uncertain. Then the matter was discussed pro and con during the year 1919 and in December of 1919 a revenue agent checked up the year 1918 and reduced the officers' salaries from $26,000.00 for the two men to $20,000.00. After that had happened the officers realized that they could not take any more salary because that would be disallowed. What further discussion was had I cannot recall now, but, shortly before May

12, 1920, I met Mr. Peterson and Mr. Pegau in the office of the attorney, Van Arsdale, and the matter was discussed there, and the attorney, Van Arsdale, drew up the contract which has been submitted here. Mr. Peterson I believe on the stand has said that I drew up the contract. He is mistaken. I was present at the time the matter was discussed in the attorney's office. The attorney can testify to that.

As we view it, the alleged secret process had, at best, a shadowy existence in fact and was seized upon as a mere pretext for diminution of the taxpayer's income reported as being subject to tax. The right of any taxpayer to minimize its taxes by legitimate devices is unquestioned, but this right presupposes that a basis for such device exists legitimately and in good faith.

Extensive argument was presented on the question whether, even though a process existed, the taxpayer did not in fact own it or was entitled at least to a shop license for its use since it was developed by its own officers in the ordinary course of their employment. In the view we take of the matter, it is unnecessary to determine the question.

The Commissioner at the hearing asked the Board to consider whether a penalty for fraud should be imposed by the Board independently under its general power to determine the ultimate amount of the deficiency. This power the Board would not hesitate to exercise under circumstances in which, in its opinion, fraudulent intent was clearly proved. In the circumstances of this appeal we are convinced that Peterson, acting under improper advice, believed he was adopting a legitimate device to avoid taxes on behalf of the corporation. The Board should not assert a penalty upon its own motion except under circumstances of fraud clearly proven. The deficiency determined by the Commissioner will be approved, but without a penalty.

ARUNDELL not participating.