Gilbert E. Nelson v. Commissioner.
Nelson v. Commissioner
Docket No. 31306.
United States Tax Court
1952 Tax Ct. Memo LEXIS 354; 11 T.C.M. (CCH) 21; T.C.M. (RIA) 52006; January 14, 1952
*354 Gross income: Constructive receipt of dividends by majority stockholder v. corporate payments for use of property. - On the facts, taxpayer's mother did not acquire any rights in any process which she licensed to the corporation and that the payments, which taxpayer claimed were bona fide payments for the use of a secret and unpatented process for the spinning of steel, were in fact, procured by taxpayer, it was held that such payments are taxable to him as dividends constructively received by him under the provisions of Code Sec. 22(a). Melvin S. Huffaker, Esq., 2766 Penobscot Bldg., Detroit, Mich., for the petitioner. J. Nelson Anderson, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent *355 determined deficiencies in the income tax of petitioner for the year 1945 in the amount of $3,606.50, for the year 1946 in the amount of $2,758.65 and for the year 1947 in the amount of $1,413.26. The sole question is whether or not payments in the respective amounts of $7,960.32, $7,347.90, and $5,308.34, made to petitioner's mother in the taxable years 1945, 1946 and 1947 by a corporation in which the petitioner owned a majority of the shares of stock outstanding, are taxable as dividends constructively received by the petitioner under the provisions of Section 22(a) of the Internal Revenue Code. Findings of Fact Petitioner is an individual residing at Holly, Michigan. His Federal income tax returns for the taxable years 1945, 1946 and 1947 were filed with the collector of internal revenue for the district of Michigan. Petitioner organized the G. E. Nelson Company as a sole proprietorship in June 1939, to engage in the business of machining and metal spinning. On July 16, 1941, he incorporated the business of the sole proprietorship under the same name and under the laws of the State of Michigan. Upon incorporation he became and ever since has continued *356 to be the president of the corporation. Its plant has always been located in Holly, Michigan. The spinning of metal is an ancient art, used in the manufacture of various articles. The process, although requiring skill, was essentially a simple one: metal was revolved in a lathe on a form, and by the application of a tool, the metal was shaped around the form. There were limitations upon the ancient art, since it could be used only on the soft metals such as copper, aluminum, and silver, and since metal thicknesses could not be controlled to close tolerances. Reynold G. Nelson, petitioner's father, devoted himself over a period of some twenty-five or thirty years to the development and improvement of the techniques of metal spinning. He developed apparatus and mastered a method for the spinning of steel and the so-called heavier metals, controlling dimensions and metal thicknesses. At some time prior to September 1935, Reynold G. Nelson was employed by The Spun Steel Corporation of Canton, Ohio. In September 1935 he organized the Alrey Steel Products Company, a Michigan corporation. He was the only member of the petitioner's family who owned stock in this corporation. He owned *357 about 25 per cent of its stock, was its president during the period of its existence, and devoted his entire time to its business. It engaged in the business of processing steel and other metals, and included in its assets were patents and spinning machines. Some of the articles spun by this corporation were steel torpedo head shells, clutch plates and steel oil seal casings. Petitioner's father used his method for controlling the thicknesses of the heavier metals while employed by Alrey and even prior thereto. Petitioner entered its employ in 1935 at the age of 24 and learned the art of spinning during the four years he was employed by it. Prior to the organization of the Alrey Steel Products Company in 1935, Reynold G. Nelson applied to the United States Patent Office for a number of patents. In 1926 he applied for a patent on apparatus for spinning articles having tubular portions and one or more flange portions integral therewith, such as crown pulleys, from the heavier gauges of soft metals and of steel. Patent No. 1,671,994 was granted on this apparatus on June 5, 1928, and the letters patent contained a detailed description of the apparatus and the method of operating its *358 various parts. He also applied for and was granted patents on improvements in this apparatus designed to make it adaptable to spinning V pulleys and the like (Patent Nos. 1,680,061, 1,728,002, 1,742,484) and internal threads upon the inside of tubular articles such as filler tubes for automobile radiators and the like (Patent No. 1,775,732). These four patents contain a description of the method of spinning the articles mentioned therein. Other patents applied for and granted to Reynold G. Nelson were upon a pulley having a plurality of annular grooves and adapted for use with different size shafts (Patent No. 1,700,416); upon a method of making wheels (Patent No. 1,774,660); and upon a sealing device (Patent No. 2,055,180). The full and exclusive rights of Reynold G. Nelson to the inventions covered by Patents 1,671,994, 1,775,732, 1,680,061, 1,728,002, 1,742,484, and 1,700,416 were assigned by him to The Spun Steel Corporation prior to the organization of the Alrey Steel Products Company in 1935. By assignment dated May 19, 1928, The Spun Steel Corporation assigned to Reynold G. Nelson an undivided one-half part of the full and exclusive rights to the inventions covered by Patents *359 1,671,994 and 1,775,732. He assigned his one-half interest in these two patents, and all of his interest in Patents 1,774,660 and 2,055,180, to the Alrey Steel Products Corporation on October 12, 1935. The assignee records of the United States Patent Office, under the name of Alrey Steel Products Company, do not disclose any other assignments of patent rights to that company. On April 1, 1948, The Spun Steel Corporation assigned all of its right, title and interest in the Nelson patents to Automatic Steel Products, Inc., of Wilmington, Delaware. The Alrey Steel Products Company ceased doing business about May 1939, because of legal actions brought against it, resulting in several judgments and the sale of its entire assets at a constable's sale to satisfy creditors. The creditors were not paid off in full. Petitioner, his father and brother, C. Milton Nelson, were present at the constable's sale but did not buy any of the assets. No other member of petitioner's family was present at the sale. Petitioner was a creditor of this corporation for salary due him for services rendered. At the time the company ceased operations in May 1939, the wages due petitioner amounted to approximately *360 $400, which have never been paid. The corporation did not go through either voluntary or involuntary bankruptcy. At the time of the constable's sale, some of the machines owned and operated by the Alrey Steel Products Company were sold to Detroit dealers. Petitioner purchased two or three of these machines from these dealers when he started in business as a sole proprietorship in June 1939; one was a spinning machine and the others standard engine lathes. The spinning machine was a converted engine lathe from which some of the gears and speeds were stripped and Timken roller bearings were put in the spindles to stand the strain. These lathes were capable of being used and were actually used by the petitioner in the spinning of the heavier metals. When the G. E. Nelson Company commenced business as a sole proprietorship in June 1939, it was thought that considerable business could be had in the spinning of articles from steel and the heavier metals, and its business has been confined largely to the spinning of such metals. It was at the start pretty much a continuance of the business of the Alrey Steel Products Company, although one of the jobs handled by the company soon after *361 it commenced operations was more intricate than anything previously performed by Alrey. Alrey could have performed this job, however, if it had had equipment which the Nelson Company acquired with funds furnished by the purchaser. In June 1939, Reynold G. Nelson turned over to petitioner certain specimens of articles spun from steel, which were thereafter used to show potential customers what could be produced. Accompanying these specimens were certain notes and other materials pertaining to such specimens and articles which had previously been manufactured. In August 1942, after the business of the G. E. Nelson Company was incorporated, a proposed contract between the company and Reynold G. Nelson was drafted by the company's attorney. After reciting that the business of the company had been built up and, to a large extent, continued to be successfully operated "upon the ability" of Renold G. Nelson to devise, build, erect and install the necessary machinery and equipment to produce the products manufactured by it, and that the parties had entered into several agreements and undertakings and desired to have them reduced to writing, the contract provided: "One "The party of *362 the first part [the G. E. Nelson Company] does hereby retain and employ the party of the second part [Reynold G. Nelson] in the capacity which he now holds with the party of the first part for and during the corporate existence of the party of the first part or any extensions thereof; "Two "The party of the second part accepts the employment and retainer of the party of the second part in the same capacity as now held by him with the party of the first part. "Three "It is mutually agreed that the party of the second part shall use, employ and exert his best skill and ability in designing, building, erecting and installing all necessary, useful and proper machinery and equipment for the use of the party of the first part and shall in every way further and encourage the business and best interests of the party of the first part. It is further mutually agreed that the party of the first part shall pay to the party of the second part a salary equal to that paid to Gilbert E. Nelson or the chief executive officer of the G. E. Nelson Company, during the lifetime of the party of the second part and, in addition to the salary hereinbefore mentioned and reserved, the said first *363 party shall pay to the said second party twenty per cent of all net profits on the products of the party of the first part which said twenty per cent shall be considered and treated as expense of operation and/or cost of production, it being the intention of the parties hereto that, during the corporate life of the party of the first part, the party of the first part shall pay to the party of the second part a salary equal to the chief executive officer or managing director of the company and in addition to such salary shall pay to the party of the second part a commission of twenty per cent of all net profits on the products of the corporation which said twenty per cent shall, in all cases, be considered and treated as cost of production. "In consideration of the foregoing covenants and agreements and as a further undertaking of the parties to this contract it is expressly agreed that the party of the first part, upon the decease of the party of the second part, shall pay to Alma Marie Nelson, the wife of the party of the second part, if she shall survive him, the sum of Three Hundred and no/100 Dollars ($300.00) each and every calendar month during her natural lifetime which said *364 sum of Three Hundred and no/100 Dollars ($300.00) shall be due and payable not later than the fifteenth day of each succeeding calendar month." * * *
This contract was never signed because the payments to be made pursuant to its provisions were not satisfactory to Reynold G. Nelson. On or about September 15, 1942, petitioner's father executed a document whereby he purported to assign to petitioner's mother all of his rights to "all methods, processes, designs, tools, and machinery, which I have designed or patented, or to which I am entitled to protection by virtue of invention and use, whether such are patented or not, which processes, designs, and machinery are now used by said G. E. Nelson Company. * * * It being my intention herewith to transfer unto said Mrs. Alma Marie Nelson all of my interest in the said G. E. Nelson Company, together with all my drawings, designs, methods of manufacture and all other incidents pertaining thereto, which are now used by the said corporation, and/or which I am entitled to the use and/or patent of by virtue of my prior use or invention." Petitioner's father owned no machinery at the time he executed the purported assignment, and if *365 any tools owned by him were in use by the company, they were not substantial in amount. He did have three letter-size file boxes about four inches thick which contained various drawings, notes and formulas. Two of these boxes were kept at his home and one at the office of the company. He did not acquire any machinery, tools or designs between the date of the purported assignment and the date of his death. He did not file any gift tax return by reason of the assignment. He had been receiving medical attention for some time prior to September 15, 1942 with respect to an illness from which he never recovered. He died on February 19, 1943. The compensation paid petitioner's father, Reynold G. Nelson, by the G. E. Nelson Company, as a sole proprietorship or corporation, for the years 1939 to 1942, inclusive, was as follows: Calendar
By Pro-
By Cor-
Year
prietorship
poration
Total
1939
None
None
None
1940
$2,582.63
None
$2,582.63
1941
1,800.39
$3,663.87
5,464.26
1942
None
4,327.26
4,327.26 These payments were for part-time services rendered by him to the company. On March 25, 1943, petitioner's mother entered into an agreement with the G. E. *366 Nelson Company wherein she agreed to allow the company to use in the conduct of its business "all the rights, titles and interests of any nature or kind whatsoever in and to all methods, processes, designs, tools and machinery, which have been designed or patented by the said Reynold G. Nelson or which the said Reynold G. Nelson * * * was and is entitled to protection of by virtue of invention and use, whether same were patented or not, together with all processes, designs and machinery, and all drawings, designs, methods of manufacture and all other incidents pertaining thereto, which have been or are used by the party of the second part and to which the said Reynold G. Nelson was entitled to the use and/or patent of by virtue of his said prior use or invention. It being the intention and desire of the party of the first part herein to allow the party of the second part the license and use of all property and methods of manufacture, which the party of the first part is now the owner of by virtue of assignment to her from the said Reynold G. Nelson, dated September 15, 1942, or otherwise, herein referred to." The agreement was for a period of one year, and the company agreed to pay *367 petitioner's mother $500 on the date of its execution and $100 each week during the life of the agreement. She agreed to extend the agreement for a consideration to be agreed upon, but in no event less than the consideration mentioned in the agreement. The original agreement of March 25, 1943 was renewed for periods of one year by supplemental agreements dated March 24, 1944, June 30, 1945, and June 29, 1946. Each supplemental agreement provided for payments of $100 per week, plus ten per cent of the gross profits of the company. The original and supplemental agreements were authorized at special meetings of the stockholders. At each of these meetings all of the company's stockholders voted in favor of the payments to petitioner's mother. When the G. E. Nelson Company was incorporated, the total stock authorized and issued was 2,500 shares of common stock with par value of $10. The stock was issued to the following persons in the indicated number of shares: Gilbert E. Nelson
2,410 shares
C. Milton Nelson
30 shares
Reynold G. Nelson
30 shares
Ross W. Mills
30 shares
Total issued and outstand-
ing
2,500 shares Ross W. Mills was at that time the secretary *368 of the corporation and handled the bookkeeping. The stock was not paid for in cash. On September 16, 1942, thirty shares of the company's stock were transferred from Reynold G. Nelson to his wife, Alma Marie Nelson, pursuant to the assignment of September 15, 1942. On October 5, 1945, petitioner transferred to his brother, C. Milton Nelson, 750 shares of the stock owned by him as a gift. The stock of the G. E. Nelson Company issued and outstanding from October 5, 1945, to June 30, 1948, was held as follows: Gilbert E. Nelson
1,660 shares
C. Milton Nelson
780 shares
Alma Marie Nelson
30 shares
Ross W. Mills
30 shares
Total issued and outstanding
2,500 shares
From 1935 until February 19, 1943, petitioner's father was his mother's only means of support and, during that period, she did not have any income. Other than the payments which the G. E. Nelson Company allegedly made to her for process rights plus a $1.00 per share dividend in 1946 on the thirty shares of stock held by her in said company, or $30, petitioner's mother, Alma Marie Nelson, received no other income during the taxable years 1945, 1946 and 1947. Petitioner's mother did not work nor had she *369 ever been employed at any time during her life. In 1947, she was about 61 years of age and in good health. During the taxable years 1945, 1946 and 1947, she owned no stocks or bonds except the thirty shares of stock of the G. E. Nelson Company, and the only other asset she owned was the home in which she lived. Petitioner's mother, Alma Marie Nelson, reported on her Federal income tax returns for the calendar years 1945, 1946 and 1947, the following amounts as having been received from the G. E. Nelson Company for the "Process Rights": 1945
$7,960.32
1946
7,347.90
1947
5,308.34
The gross sales, returns and allowances, net sales, gross profits, compensation of officers, payments for process rights, net income before taxes of the G. E. Nelson Company for the fiscal year ended June 30, 1942 to June 30, 1947, inclusive, as reported in its Corporation Income and Declared Value Excess-Profits Tax returns were: Payments
Returns
Compen-
for
Fiscal
Gross
and
Gross
sation of
Process
Year Ended
Sales
Allowances
Net Sales
Profits
Officers
Rights
6/30/42
$ 54,153.20
$ 253.65
$ 53,899.55
$ 16,749.18
$ 8,109.99
None
6/30/43
93,842.15
1,005.15
92,837.00
37,757.59
19,190.00
$ 1,900.00
6/30/44
316,748.53
9,845.19
306,903.34
103,971.18
39,403.63
10,809.37
6/30/45
197,784.46
2,900.30
194,884.16
77,508.36
23,541.28
7,960.32
6/30/46
153,778.62
6,030.06
147,748.56
58,975.20
22,165.53
7,347.90
6/30/47
108,329.49
1,520.98
106,808.51
42,130.87
15,400.00
5,308.34
*370 Net
Income
Fiscal
Before
Year Ended
Taxes
6/30/42
$ 2,730.36
6/30/43
(583.79)
6/30/44
30,112.39
6/30/45
14,122.92
6/30/46
12,747.18
6/30/47
1,556.67
he machinery owned and operated by the G. E. Nelson Company from the date of its incorporation, July 16, 1941, through its fiscal year ending June 30, 1947, consisted principally of lathes used in ordinary machine work. In some instances parts were replaced by other parts and in some cases attachments were made to the lathes so that they could be used for spinning steel and other metals. During the fiscal year ended June 30, 1945 the G. E. Nelson Company owned and operated approximately ten or twelve spinning lathes which were used in the spinning of steel or heavier metals. During that year these lathes were operated near capacity on a two-shift basis and the company had approximately twenty-four employees engaged in the spinning operations of those lathes. It was possible for employees of the G. E. Nelson Company to acquire a knowledge of the methods used by it in spinning articles of manufacture produced by the company. Two employees, one of whom had occasion to observe its operations while *371 working in a supervisory capacity, formed a partnership and engaged in the metal spinning business under the trade name of the Precision Metal Spinning Company. The parties have stipulated that the Court may take judicial notice of advertisements in Thomas' Register of American Manufacturers, which beginning at least as early as 1939 discloses a number of companies that held themselves out to be engaged in the spinning of metals, some of them specifically listing monel metal, steel and stainless steel, and some of them holding themselves out further as being capable of spinning to close tolerances. The G. E. Nelson Company did not acquire from the petitioner's mother on March 25, 1943, or on any subsequent date, the use of any secret process or of any valuable patented or unpatented process for the spinning of articles of manufacture from steel and the heavier metals. The amounts in controversy paid to petitioner's mother during the years 1945, 1946, and 1947 did not constitute royalties, rents, or other fees for the use of any process that she had made available to the G. E. Nelson Company; they were paid to her by reason of petitioner's desire that she receive such amounts, *372 and petitioner's dominant position in the G. E. Nelson Company enabled him to procure such payments for his mother by the corporation. Opinion RAUM, Judge: The basic issue in this case is essentially one of fact, namely, whether the arrangement whereby the G. E. Nelson Company paid the amounts in controversy to petitioner's mother was a bona fide business arrangement compensating her for property rights, or whether it was merely a device whereby petitioner procured the payments by the corporation to his mother. Petitioner contends that his mother was the owner of a secret unpatented process for the spinning of steel and other heavier metals; that his mother acquired the rights to that process by assignment from his father; and that the payments in question constituted bona fide consideration for the use of that process by the corporation. We have been unable to find that there was any such secret process. The testimony of petitioner was vague, unsatisfactory, and evasive in this connection. He was unable to state satisfactorily when the alleged secret process was first communicated to him; nor did he undertake to indicate the circumstances (time, place, etc.) in which he learned *373 the alleged secret process. He testified vaguely that he learned it after he had organized the sole proprietorship in 1939. He also testified in substance that the manufacturing operations of the sole proprietorship and of the corporation which succeeded it were based almost entirely upon such process. However, it must be remembered that the sole proprietorship was organized shortly after Alrey Steel Products Company had ceased doing business, and that petitioner commenced his business, using machines that had formerly been owned by Alrey. We are satisfied, on the evidence, that the sole proprietorship merely engaged in the same kind of activity that had formerly been conducted by Alrey, and that as new and more challenging tasks were presented to the sole proprietorship and later to the corporation, such tasks were handled simply by adapting and improving the techniques and skills theretofore employed. Certainly, petitioner, upon whom the burden of proof rests, has failed to convince us, although he has attempted to do so, that the activities of the business which he organized in June 1939 were of a wholly different character from the activities of Alrey at the time the latter drew *374 its last breath in the spring of 1939. We are satisfied that there was substantial continuity, to the extent of the nature of the basic operations carried on by both organizations. This is highly significant, because there is no suggestion whatever that the activities of Alrey were based upon any secret process; indeed petitioner asserts that Alrey had no such process. At most, petitioner has shown that in the course of time the G. E. Nelson Company performed a number of jobs that were more intricate or difficult than any which had previously been executed by Alrey. But we have no reason to believe that such jobs could not have been performed by Alrey had it continued in business with employees skilled in the art and had it acquired such additional equipment as might have been needed from time to time. We do not believe that the G. E. Nelson Company employed any process, not theretofore available to Alrey, which could have served as the basis for any license agreement between it and petitioner's mother. Cf. Peterson & Pegau Baking Co., 2 B.T.A. 637. It has not been feasible to include all of the evidence in our findings, but we have found on the entire record that petitioner's *375 mother did not acquire any rights in any secret process which she licensed to the G. E. Nelson Company, and that the payments in controversy were in fact procured for her by petitioner. Although a number of considerations fortify that conclusion, we shall mention only several of them. It is a matter of some significance that although petitioner's father was paid for the services that he rendered to the G. E. Nelson Company, he received no royalties or other compensation for the use of any process from the time the sole proprietorship was organized in 1939 until September 15, 1942, the date of the purported assignment to petitioner's mother. Nor were any payments made thereafter, either to the mother or the father, until one month after his death. Moreover, the royalty arrangement herein was an outgrowth of earlier negotiations with petitioner's father looking towards making provision for petitioner's mother after the father's death. Those negotiations had reached the point where a proposed contract was drafted which provided in this connection for the payment of $300 a month to petitioner's mother for life after his father's death. Nowhere in that proposed agreement was there any *376 suggestion that such payments would constitute compensation in any form for the use of any process. True, that agreement was not executed; but it was introduced in evidence by petitioner himself for the purpose of attempting to show the bona fides of the arrangements finally entered into after his father's death, and the only reason that he gave as to why it had not been signed was that the amounts were not satisfactory to his father. Surely, it was a laudable purpose to provide for petitioner's mother, particularly since his mother apparently had no source of income of any consequence and since petitioner owed his success in the metal spinning business in large measure to his father's guidance. But that honorable purpose cannot convert into royalties or like payments the amounts which were thus paid over to petitioner's mother. An additional element casting doubt upon the genuineness of the payments in question as royalties or like consideration is the fact that the amounts actually paid to her during the years involved fell considerably short of amounts called for by her contracts with the company. Pursuant to those contracts she was entitled not only $100to a week but also to *377 10 per cent of the gross profits. However, it is plain from our findings as to the company's gross profits that the payments actually made to petitioner's mother were considerably less than the amounts required by the contracts. This suggests that the amounts in fact paid to her were determined in such fashion as to provide for her needs or comfort, and were not true royalties or compensation for the use of a process. Respondent argues that petitioner was under a legal obligation to support his mother and that the payments in question discharged that obligation. There may well be substantial doubt under Michigan law, as urged by petitioner, whether such an obligation existed here. But that does not prevent charging petitioner with the amounts paid to his mother. if he in fact caused his corporation to make such payments. It was indeed, as indicated above, a laudable purpose to provide for his mother. Nevertheless, had the money been paid directly to him in the first instance, there could be no question that it would not lose its quality as income to him merely because he paid it over to his mother, whether or not it was in discharge of a legal obligation. And we think that neither *378 the substance of the transaction nor the tax consequences were changed by petitioner's causing the payments to be made by the corporation directly to his mother, if such was the fact. Three tax years are here involved, 1945, 1946 and 1947. Evidence was presented as to three contracts pursuant to which the amounts were paid. These contracts were dated March 24, 1944, June 30, 1945, and June 29, 1946. At the time of the execution of the first two of these three contracts, petitioner owned 2,410 out of a total of 2,500 shares of the corporation's stock. His mother owned 30 shares, a brother 30 shares, and an employee the remaining 30 shares. We are convinced that the corporate action taken was controlled entirely by petitioner. The burden of proof was on him and he has not shown otherwise. During the period between the execution of the second and third contracts, he had given 750 of his shares to his brother without consideration. Petitioner still retained ownership of over 60 per cent of the total stock. We are satisfied, and petitioner has not undertaken to prove otherwise, that this third contract merely followed the pattern of the other two, that the other stockholders merely acquiesced *379 in the corporate action that he desired to be taken, and that he may in truth and in fact be regarded as having procured the payments from his corporation to his mother. In these circumstances we hold that the Commissioner's determination must be sustained. Petitioner makes an alternative contention that even if the amounts involved did not constitute royalties or other compensation to his mother, they were in any event dividends to her, cf. Lincoln Nat. Bank v. Burnet, 63 Fed. (2d) 131 (C.A.D.C.), rather than to him. The difficulty with that contention is that the amounts were not paid to her in any way in her capacity as a stockholder. It was a wholly fortuitous circumstance that she held 30 shares of stock, and the payments to her had no connection whatever with her ownership of those shares. Decision will be entered for the respondent.